ATCHISON, T. & S. F. RY. CO. et al. v. WORD.

(Court of Civil Appeals of Texas. Amarillo. May 3, 1913. Rehearing Denied May 31, 1913.)

1. CARRIERS (§ 203*) — LIVE STOCK — INTERSTATE SHIPMENT—WHAT LAW GOVERNS.

An action for damages to a shipment of cattle from one state to another must be disposed of under the interstate commerce act of Feb. 4, 1887, c. 104, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), and the decisions of the federal court construing it.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 203.*]

2. CARRIERS (§ 230*) — CARRIAGE OF LIVE STOCK—NOTICE OF INJURY.

In an action against a railroad company for injuries to an interstate shipment of live stock, the question whether a stipulation requiring notice of claim for injury was reasonable is for the court.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 961, 962; Dec. Dig. § 230.*]

3. CARRIERS (§ 177*) — CARRIAGE OF LIVE STOCK—LIABILITY OF INITIAL CARRIER.

Under the direct provisions of the Carmack amendment (Act June 29, 1906, c. 3591, § 7, 34 Stat. 593 [U. S. Comp. St. Supp. 1911, p. 1307]) to the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]), the initial carrier, engaged in interstate commerce and receiving property for transportation from a point in one state to a point in another, having contracted for through carriage to the point of destination, is liable to the lawful holder of the receipt or bill of lading for any loss or damage to the property, regardless on which carrier's lines it occurred.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 775–789, 791–803; Dec. Dig. § 177.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

**4. CARRIERS (§ 180\*) — CARRIAGE OF LIVE STOCK—CONTRACTS—CONSIDERATION.**

Where an initial carrier issued to a shipper of live stock a through bill of lading which entitled him to carriage over the lines of connecting railroads, the contract with the initial carrier fixed the liability of the various carriers, the shipment being an interstate one, and consequently a new bill of lading issued by a connecting carrier which limited its liability was without consideration and ineffectual.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 815–828; Dec. Dig. § 180.\*]

**5. APPEAL AND ERROR (§ 1062\*)—REVIEW—HARMLESS ERROR.**

In an action against several carriers, among whom was a connecting carrier, where a stipulation limiting the connecting carrier's liability was unenforceable, being without consideration, the submission of the validity of the limitation to the jury, while improper, was harmless to the connecting carrier.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4212–4218; Dec. Dig. § 1062.\*]

**6. EVIDENCE (§ 471\*)—OPINION EVIDENCE—WHAT CONSTITUTES.**

In an action against a carrier for injuries to a shipment of cattle, testimony by a farmer and stock man, who saw the cattle as soon as unloaded, that they looked as though they had had bad treatment and not like cattle that were in the flesh they were in should look is not opinion evidence but is merely a statement of the facts as to the condition of the cattle as they appeared to the witness.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2149–2185; Dec. Dig. § 471.\*]

**7. CARRIERS (§ 208\*) — CARRIAGE OF LIVE STOCK—DUTY.**

When a railroad company accepts live stock for transportation, it must exercise ordinary care in the handling and operation of the cars in which the live stock are riding and in transporting them within a reasonable time to their destination.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 924–928; Dec. Dig. § 208.\*]

**8. CARRIERS (§ 230\*) — CARRIAGE OF LIVE STOCK—QUESTIONS FOR JURY.**

In an action against a carrier for damages for delay in a shipment of live stock, evidence *held* to raise the issue whether the carrier's negligence proximately caused the holding of the cattle on board the cars beyond the required time.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 961, 962; Dec. Dig. § 230.\*]

**9. TRIAL (§ 296\*)—CARRIAGE OF LIVE STOCK—ACTIONS—INSTRUCTIONS.**

In an action against carriers of live stock for damages for negligent delay, an instruction that there was no evidence of partnership between any of the carriers, and therefore each was separately liable, and that no defendant could be held liable in damages for delay or injuries from any cause not occasioned proximately by its own act, cures a charge improperly permitting a finding of liability against one carrier for injury from its own negligence or that of another carrier.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 705–713, 715, 716, 718; Dec. Dig. § 296.\*]

**10. CARRIERS (§ 229\*) — CARRIAGE OF LIVE STOCK—DAMAGES—MEASURE.**

In an action against a carrier for damages to live stock, caused by rough handling and negligent delay, the shipper's measure of damages is the difference between their market value in the condition and at the time they should have arrived and in the condition and at the time when they actually did arrive.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 930, 963, 964; Dec. Dig. § 229.\*]

**11. CARRIERS (§ 213\*) — CARRIAGE OF LIVE STOCK—DELAY—DEFENSES.**

Where a carrier of live stock, with knowledge of the congestion of its lines, accepted a shipment of live stock without notice to the shipper that such condition would likely cause extraordinary delay, it is no defense that the shipments were unusual and that the carrier was not prepared to handle them.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 920–922; Dec. Dig. § 213.\*]

**12. CARRIERS (§ 228\*) — CARRIAGE OF LIVE STOCK—DEFENSES—BURDEN OF PROOF.**

When an extraordinary delay in the transportation of a shipment of live stock is sought to be excused by the carrier on the ground of unusual congestion, the carrier has the burden of proof to show every fact essential to the validity of its excuse.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 957–960; Dec. Dig. § 228.\*]

**13. CARRIERS (§ 213\*) — CARRIAGE OF LIVE STOCK—DEFENSES.**

A carrier of live stock is charged with notice of the congested condition of its lines in a given locality, and so cannot excuse delay in a shipment of cattle on the ground that there were unusually heavy shipments of cattle at that time which it was not prepared to handle.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 920–922; Dec. Dig. § 213.\*]

**14. CARRIERS (§ 213\*) — CARRIAGE OF LIVE STOCK—LIABILITY.**

While a carrier of live stock is not an insurer of the time at which they will arrive, it is otherwise subject to the common-law burdens and is an insurer of the safe handling of such live stock.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 920–922; Dec. Dig. § 213.\*]

**15. CARRIERS (§ 230\*) — CARRIAGE OF LIVE STOCK—ACTIONS—INSTRUCTIONS.**

Charges, in an action against carriers for damage to a shipment of live stock, that the basis of recovery is unnecessary and unreasonable delay, proximately causing damage to the cattle, and if otherwise it is not actionable, and that when a railroad company accepts live stock for transportation it must exercise ordinary care in the handling and operation of the cars in which such stock are riding, do not cast upon the carriers the penalty of handling the cattle at their peril so as to avoid injury.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 961, 962; Dec. Dig. § 230.\*]

**16. APPEAL AND ERROR (§ 728\*) — ASSIGNMENTS—SUFFICIENCY.**

An assignment of error to the exclusion of part of the testimony of two witnesses presents no question for review where the testimony was not set out, and the general statement merely was that they were not permitted to state certain facts elicited from other witnesses.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3010–3012; Dec. Dig. § 728.\*]

**17. APPEAL AND ERROR (§ 728\*) — ASSIGNMENTS OF ERROR—SUFFICIENCY.**

An assignment of error to the admission of testimony should set out the testimony objected to.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3010–3012; Dec. Dig. § 728.\*]

Appeal from District Court, Potter County; J. N. Browning, Judge.

Action by C. T. Word against the Atchison, Topeka & Santa Fé Railway Company and others. From a judgment for plaintiff, defendants, except the Ft. Worth & Denver City Railway Company, appeal. Affirmed.

Madden, Trulove & Kimbrough and F. M. Ryburn, all of Amarillo, Terry, Cavin & Mills, of Galveston, and T. B. McCormick, of Dallas, for appellants. W. Boyce and Turner & Wharton, all of Amarillo, for appellee.

HUFF, C. J. The appellee, C. T. Word, sued the Ft. Worth & Denver City Railway Company, together with the appellants, the Atchison, Topeka & Santa Fé Railway Company, the Southern Kansas Railway Company of Texas, and the Missouri Pacific Railway Company, for damages to three shipments of cattle. On April 16, 1910, C. T. Word delivered to the Ft. Worth & Denver City Railway Company, at Simmons, Tex., for shipment to Summit, Kan., 1,971 head of cattle to be transported over the lines of the above-named companies. These were shipped in two trains; the first shipment consisting of 35 cars and the second shipment containing 27 cars. On the 30th day of April, 1910, appellee delivered to the Ft. Worth & Denver City Railway Company, at Simmons, Tex., for transportation, 67 head of cattle, two cars, over the lines of the Ft. Worth & Denver City Railway Company and the appellants in this case to Summit, Kan. Unreasonable delay en route, rough handling, etc., is alleged, and consequent injury to the cattle and damage therefrom.

The Ft. Worth & Denver City Railway Company answered by general and special plea, and among other things pleaded the terms of the shipping contract, limiting its liability to loss or injury occurring on its own line of road. The Atchison, Topeka & Sante Fé Railway Company and the Southern Kansas Railway Company of Texas answered jointly, generally, and specially, and the Missouri Pacific Railway Company also answered generally and specially. The respective pleas of the parties will be stated more in detail in discussing the several assignments. Judgment based upon the verdict of the jury trying the cause was rendered for appellee Word against the Atchison, Topeka & Santa Fé Railway Company for $1,329, against the Southern Kansas Railway Company of Texas for $771.45, and the Missouri Pacific Railway Company for $2,185.60; no damages were assessed against the Ft. Worth & Denver City Railway Company. The case appears to have been tried in the court below upon the theory that it was governed alone by the statutes and decisions of this state and the briefs of the respective parties so treat the case, but by supplemental citation of authorities counsel for the Santa Fé roads call attention to the fact that this case is controlled by the interstate commerce act.

The first, second, third, fourth, fifth, and sixth assignments relate to pleadings and contracts of shipment of the two roads, the Atchison, Topeka & Santa Fé and the Southern Kansas Railway Company of Texas, designated by us for brevity as the Santa Fé, setting up and pleading certain clauses of the shipping contract with reference to notice of claims for damages as a condition precedent to the right of recovery. The contracts so set up are those executed by the Santa Fé. The fourth paragraph (a, b, and c) of the Santa Fé's answer is as follows:

"(a) That the liability of each carrier should be and was limited to its own acts and lines, and terminated upon its delivery or upon tendering delivery to its succeeding connecting carrier, and that such defendant was in no wise to be held liable for any loss or damage occurring off its line of railway; that these defendants received said cattle at Amarillo, Tex., and transported the same over their lines of road to Wichita, Kan., at which place their connection with said shipments ceased; that they transported and handled said stock with reasonable care and dispatch, and no damages or injuries whatever occurred to said stock while on their line of road or while in their charge.

"(b) That defendants further stipulated and provided in said shipping contracts, under terms of which said stock was transported by these defendants, that the plaintiff should load, unload, and reload said stock, and look after and care for same while in transit; that, if plaintiff's said cattle sustained any damages as alleged in his petition, such damages resulted from plaintiff's failure to properly load, unload, and reload said stock and properly look after and care for same while in transit, and his failure to properly load, unload, and reload and look after and care for said cattle while in transit, as provided for in said shipping contracts, and plaintiff's own negligence in these respects and in these particulars became and was the direct and proximate cause of any and all such damages as he may have sustained.

"(c) That no claim for damages to said cattle should be recoverable, unless written claim therefor should be presented to the defendant carrier within 91 days after such damages occurred. Defendants would represent that no claim in writing claiming damages to said several shipments of cattle, as sued for in plaintiff's petition, was within the 91 days after such damage had occurred ever in fact presented to these defendants, or to either of them, as required under the terms of said written contract. And defendants plead said shipping contract in bar of plaintiff's right to recover herein."

The appellee, Word, replied to said answer as follows:

"And for further answer herein, plaintiff

says that his cattle were shipped on a through rate, billed from Simmons, Tex., to Summit, Kan., the freight being paid in advance to the initial carrier, the Ft. Worth & Denver City Railway Company. That thereupon all defendants were bound to transport said cattle without further contract. That said contracts were executed after said cattle were loaded and had been transported over a portion of their journey and were without further or additional consideration. That said contracts were printed in such small type that it is very difficult for an ordinary person to read them and of such great length that it would require great delay in transportation for the parties who executed such contracts to take the time to read over and understand such contracts. That they contain many illegal and void provisions, and in particular the provisions referred to in said contracts in paragraph c of subdivision 4 are so intermingled with and dependent upon other provisions contained in said contract, which are illegal and void, that the same cannot be separated from said void and illegal provisions. That said contracts are so printed in such small type, at such great length, and intermingled with said void and illegal provisions for the fraudulent purpose on the part of the defendants of entrapping, confusing, and misleading persons to whom said contracts were presented for signature and for the purpose of preventing a reading thereof on the part of the shippers and an understanding on their part of such provisions, if the same should be read. That the plaintiff did not read said contracts before signing same and did not know that such contracts contained the provision set forth in said paragraph of said answer. That under the law the initial carrier in such a shipment, to wit, the Ft. Worth & Denver City Railway Company, would be responsible to the plaintiff for the entire damages sustained in the course of such transportation. That the plaintiff within due time presented notice of his said claim to said defendants, and that the provision in said contracts with the other defendants, requiring the presentation of notice to them, was unreasonable and void."

The contracts entered into by the appellee with the Ft. Worth & Denver City Railway Company were all of the same form and were alike, except as to dates, numbers of cars, cattle, etc., and in part are as follows:

"Live Stock Contract.

"Executed at Simmons station, 4/16/1910. This agreement made between the Ft. Worth & Denver City Railway Company of the first part, herein called the carrier, and C. T. Word, of the second part, herein called the shipped, Witnesseth: That, for the consideration and the mutual covenants and conditions herein contained, the said carrier acknowledges receipt at Simmons and agrees to transport for the shipper the live stock described below, together with the parties in charge thereof, as hereinafter provided, viz.': 27 cars, said to contain 875 head of cattle from Simmons station to Summit, Kansas, consigned to C. T. Word, Summit, Kansas" —giving the number of cars, initials, number of cattle, etc. It is further provided in case the cattle were to be transported over the roads of any other railway company that the carrier should be released from liability of every kind after said stock shall have left its road, and that its liability should be limited to its own line of railway. This is substantially all of the Denver Railway Company's contract, as set out in the record.

The contract set up by the Santa Fé occupies some 17 pages of the record, but the clause set out and upon which stress is laid by said Santa Fé is No. 8, and is as follows:

"Eighth. In order that any loss or damage to be claimed by the shipper may be fully and fairly investigated and the fact and nature of such claim or loss preserved beyond dispute and by the best evidence, it is agreed that as a *condition precedent* to his right to recover any damages for any loss or injury to his said stock during the transportation thereof, or at any place or places where the same may be loaded or unloaded for any purpose on the company's road, or previous to loading thereof for shipment, the shipper or his agent in charge of the stock will give *notice in writing* of his claim therefor to some officer of said company, or to the nearest station agent, or, if delivered to consignee at a point beyond the company's road, to the nearest station agent of the last carrier making such delivery before such stock shall have been removed from the place of destination above mentioned, or from the place of delivery of the same to the consignee, and before such stock shall have been slaughtered or intermingled with other stock, and will not move such stock from said station or stock yards until the expiration of three hours after the giving of such notice; and a failure to comply in every respect with the terms of this clause shall be a complete bar to any recovery of any and all such damages. The written notice herein provided for cannot and shall not be waived by any person except a general officer of the company, and he only in writing. Nor shall any such damage be recoverable unless written claim therefor shall be presented to the company within 91 days after the same may have occurred."

The testimony shows that all the freight money was paid on the three shipments to the Ft. Worth & Denver City Railway Company from Simmons, Tex., to Summit, Kan., and the bills of lading were issued by that road to Summit, Kan., from Simmons. The cattle were transported by the Denver from Simmons to Amarillo, at which point they were delivered to the Santa Fé, which road transported them from Amarillo, Tex., to

Wichita, Kan. The Santa Fé delivered the cattle to the Missouri Pacific Railway Company at Wichita, Kan., which latter road completed the voyage to Summit, Kan.; the entire distance from Simmons to Summit being about 402 miles. The appellee testified he signed the contract of the Santa Fé at Amarillo upon the delivery of the cattle at that point to the Santa Fé Railway; that he did not read it but that he expected to sign it when he went to the Santa Fé yards. The contract looked to him about like all of them and he thought it about the usual one. He stated he had never read one of the contracts and that it was with difficulty he could read the fine print; that he signed it up as a pass and did not know that it contained the stipulation requiring notice to be given of the damage within 91 days.

The assignments from 1 to 6, inclusive, complain of the court's charge in submitting to the jury the reasonableness of the stipulation contained in the contract, refusal of certain requested special charges, and with reference to the admission of certain testimony. We have concluded it is not necessary to set out the charge of the court or to give the requested instructions. The contention of appellee in reply to appellant is that under the statutes of this state (article 3379, Sayles' Statutes) and the decisions of the courts of this state it was proper for the court to submit to the jury the question of whether or not the stipulation requiring notice was reasonable. Appellee cites us to Railway Co. v. Greathouse, 82 Tex. 104, 17 S. W. 838; Railway Co. v. Bryce, 49 Tex. Civ. App. 608, 110 S. W. 529; Railway Co. v. Barber, 30 S. W. 500; Railway Co. v. Battle, 107 S. W. 635; Railway Co. v. Childers, 1 Tex. Civ. App. 302, 21 S. W. 76; Railway Co. v. Leibold, 55 S. W. 369; Railway Co. v. Honea, 84 S. W. 267; Railway Co. v. Harris, 67 Tex. 166, 2 S. W. 577. There appears to be a conflict between some of the decisions as to the question upon whom the burden rests to show the reasonableness or unreasonableness of stipulations requiring notice of damage to shipments of cattle. Appellants cite us to authorities which hold, as we believe, that when the contract requires notice not less than 90 days, especially since the Act of 1897, art. 3379, it is incumbent on the shipper to allege and prove that the stipulation for notice is unreasonable. Railway Co. v. Mayes, 44 Tex. Civ. App. 31, 97 S. W. 318; Railway Co. v. Heittner, 42 Tex. Civ. App. 617, 94 S. W. 189; Railway Co. v. Gallagher, 70 S. W. 97; Railway Co. v. Byers, 73 S. W. 427; Railway Co. v. Davis, 88 Tex. 594, 32 S. W. 510. We do not think the case of Railway Co. v. Curtis Bros., 44 Tex. Civ. App. 477, 99 S. W. 566, can be said to fully support appellant's proposition. This exact provision was under review by the courts in several cases, and especially the case of Railway Co. v. Evans-Snider-Buel Co., 42 Tex. Civ. App. 60, 93 S. W. 1024, and 100 Tex. 190, 97 S. W. 466. The Court of Civil Appeals held that the clause requiring 91 days' notice as a condition precedent to the right to sue therefor was so connected with certain illegal stipulations in the same clause as to render all of them void. The Supreme Court granted a writ of error on that holding, but disposed of the case on other grounds without determining the validity of the clause. 100 Tex. 190, 97 S. W. 466. It might be, as the evidence indicates in this case, that the shipper could not ascertain the full extent of the injury or damage to his cattle until some time after the delivery of the cattle. If it is meant that he should at the delivery state his damage at that time when he is not fully aware of the extent of the injury to the cattle himself and be thereby bound by such notice or claim, it might be requiring of him an unreasonable thing. However, we do not care to express an opinion as to what the rule is or should be with reference to shipments wholly within this state.

[1, 2] This case must be disposed of under the interstate commerce act and the decisions of the Supreme Court of the United States, and under the holdings of that court we would feel it to be our duty to reverse the case upon the charge of the court under the pleadings and evidence, if that was the only issue. The Supreme Court of the United States, discussing the interstate commerce act, through Mr. Justice Lurton, in Railway Co. v. Harriman Bros., 227 U. S. 657, 33 Sup. Ct. 397, 57 L. Ed. ——, says that the question as to whether such provision is reasonable is one of law for the determination of the court. We believe under the construction of the interstate commerce act by that court that it was the duty of the trial court to have instructed the jury to return a verdict for the Santa Fé road unless the contract pleaded was in violation of the law and without consideration.

[3-5] The appellee Word did not base his cause of action on a contract pleaded by the Santa Fé, but alleged a contract with the Ft. Worth & Denver City Railway Company for a shipment from a point in one state to a point in another state. The evidence established that he made such a contract and paid the freight charges for such shipment, "together with the parties in charge thereof." After this contract was entered into the Santa Fé required him to execute another contract. What was the consideration for this contract? He had paid the freight charges prior thereto to the Ft. Worth & Denver Railway Company and received his receipt or bill of lading for a through shipment. There is no allegation or proof showing any such limitation in the bill of lading executed by the Ft. Worth & Denver City Railway Company for the shipment of the cattle. The question, therefore, depends alone upon whether the bill of lading issued by the Santa Fé is to be treated as a contract of shipment over its line or as a part thereof.

By the Carmack amendment to the interstate commerce act, "the initial carrier is liable to the lawful holder thereof [the receipt or bill of lading] for any loss, damage or injury to such property, caused by it." Mr. Justice Lurton said, in the case of Atlanta C. L. R. Co. v. Riverside Mills, 219 U. S. 186, 31 Sup. Ct. 164, 55 L. Ed. 167, 31 L. R. A. (N. S.) 7: "The indisputable effect of the Carmack amendment is to hold the initial carrier engaged in interstate commerce and 'receiving property for transportation from a point in one state to a point in another state' as having contracted for through carriage to the point of destination using the lines of the connecting carriers as its agents." Again, on page 199 of 219 U. S., on page 167 of 31 Sup. Ct. (55 L. Ed. 167, 31 L. R. A. [N. S.] 7), of the above report that court said: "Along with this singleness of rate and continuity of carriage there grew up the practice by receiving carriers, illustrated in this case, of refusing to make a specific agreement to transport to points beyond its own line whereby the connecting carrier, for the purpose of carriage, would become the agent of the primary carrier. The common form of receipt, as the court may judicially know, is one by which the shipper is compelled to make with each carrier in the route over which his package must go a separate agreement limiting the carrier liability of each separate company to its own part of the through route. As a result the shipper could look only to the initial carrier for recompense for loss, damage, or delay occurring on its part of the route. If such primary carrier was able to show a delivery to the rails of the next succeeding carrier, although the packages might and usually did continue the journey in the same car in which they had been originally loaded, the shipper must fail in his suit. He might, it is true, then bring his action against the carrier so shown to have next received the shipment. But here, in turn, he might be met by proof of safe delivery to a third separate carrier. In short, as the shipper was not himself in possession of the information as to when and where his property had been lost or damaged, and had no access to the records of the connecting carriers who, in turn, had participated in some part of the transportation, he was compelled in many instances to make such settlement as should be proposed. This burdensome situation of the shipping public in reference to interstate shipments over routes, including separate lines of carriers, was the matter which Congress undertook to regulate." Again that court says on page 205 of 219 U. S., on page 169 of 31 Sup. Ct. (55 L. Ed. 167, 31 L. R. A. [N. S.] 7): "Reduced to the final results, the Congress has said that a receiving carrier, in spite of any stipulation to the contrary, shall be deemed, when it receives property in one state, to be transported to a point in another, involving the use of a connecting carrier for some part of the way, to have adopted such other carrier as its agent and to incur carrier liability throughout the entire route, with the right to reimbursement for a loss not due to his own negligence."

If the Ft. Worth & Denver Railway Company was a principal in making the contract for the through shipment and received the consideration therefor, the act of the Santa Fé procuring a contract for such shipment over the same route, was, as we think, without consideration and contrary to law. It was but the agent of the Denver Road and under the law was charged with the duty of carrying out the contract of its principal, with no right or power to ingraft new conditions and stipulations on the contract already lawfully executed, binding it fully to perform its part of the contract of carriage under the terms of said contract. Stipulations in the contract of the initial carrier were ineffectual in so far as not authorized by the interstate commerce act, whether for its benefit or that of the intermediate carrier. Any provision valid in the initial carrier's contract for its own benefit will therefore inure to the benefit of the connecting carrier. Kansas City S. R. Co. v. Carl, 227 U. S. 639, 33 Sup. Ct. 391, 57 L. Ed. ——. In that case it is said: "The liability of any carrier in the route * * * for loss or damage is that imposed by the act as measured by the original contract of shipment so far as it is valid under the act." Adams Express Co. v. Croninger, 226 U. S. 491, 33 Sup. Ct. 148, 57 L. Ed. 314; Railway Co. v. Latta, 226 U. S. 519, 33 Sup. Ct. 155, 57 L. Ed. 328; Railway Co. v. Miller, 226 U. S. 513, 33 Sup. Ct. 155, 57 L. Ed. 323; Railway Co. v. Harriman Bros., 227 U. S. 657, 33 Sup. Ct. 397, 57 L. Ed. ——.

It will be seen from the above authorities that the contract of the initial carrier is one fixing the liability of the parties executing the contract, as well as that of the connecting carrier. It follows that any contract made, or attempted to be made, by the intermediate carrier has no binding effect with reference to the shipment while in the course of transportation. The case of Railway Co. v. Carl, supra, appears to be authority for the shipper to sue the intermediate carrier direct. Railway Co. v. Ray, 127 S. W. 281. And we hold that he may sue the initial carrier, together with the connecting carriers, over whose lines of road the shipment is routed, and the respective liabilities of the parties fixed in that suit.

We therefore conclude that the provision pleaded by the Santa Fé, as part of the contract executed by it, was no part of the contract for the transportation of the cattle from Simmons, Tex., to Summit, Kan., executed and delivered by the Ft. Worth & Denver City Railway Company to the appellee, Word, and therefore the error committed by the trial court in its charge or in refusing the requested instructions and in the admission of the testimony, with reference

to matters relating to the contract, are harmless, and no such injury resulted to the appellants as will require a reversal of the case. The assignments from 1 to 6, inclusive, are therefore overruled.

[6] By the seventh assignment, appellant asserts that the court erred in admitting that portion of the statement of the witness D. R. Blankenship and in permitting it to be read to the jury: "They (the cows) looked as though they had had bad treatment. They didn't look like cattle should that were in the flesh that they were in." The objection is that the witness states an opinion and conclusion not based upon the facts within his own knowledge. The bill indicates the witness at least saw the cattle and looked at them and observed their flesh and condition. Mr. Blankenship, from his testimony, as found in the record, shows that he was a farmer and handled cattle and that the cattle were pastured on his place. He appears to have seen the cattle in the yards at Summit soon after they were unloaded. While he does not appear to have been used as an expert, we do not think the bill shows any such injury to appellants, by reason of his testimony, as will require a reversal. It is sometimes hard to determine just what is opinion and what is fact, but the testimony simply appears to be an effort to convey the facts with reference to the condition of the cattle.

[7] By the eighth assignment it is urged the court erred in giving the fourth paragraph of his charge, which is as follows: "When a railway company accepts live stock for transportation it becomes its duty to exercise ordinary care in the handling and operation of its cars in which such live stock are riding, so as to avoid injury to the stock, and must exercise ordinary care to transport them to their destination, or to the next connecting carrier over whose lines such stock must be transported. What would be a reasonable time in a given case must be determined by the jury from all the facts and circumstances of the case, as shown by the testimony, in view of the character of the shipment and its liability to injury, either in the handling or in the time of transportation." We think the charge is substantially correct. P. & N. T. Ry. Co. v. Bitting, 140 S. W. 382; Railway Co. v. Ellison, 70 Tex. 491, 7 S. W. 785; Martin v. Railway Co., 87 Tex. 117, 26 S. W. 1053. The appellants evidently knew that the cattle were delivered to them for transportation over their lines of road and must have known something of the probability of injury to the cattle by delay or rough handling.

[8] Complaint is made to paragraph 5 of the court's charge, because it is asserted the evidence did not raise the issue of negligence of the Atchison, Topeka & Santa Fé Railway Company in holding appellee's cattle on board the cars after the expiration of 36 hours. The particular portion of the charge complained of is as follows: "Or if you find and believe from the evidence that the cattle in the first shipment of 35 cars were held on the cars for an unreasonable length of time without being unloaded for food, water, and rest, and that such act was due to the negligence, if any, of the defendant, the Atchison, Topeka & Santa Fé Railway Company or the Missouri Pacific Railway Company, and that by reason thereof the cattle sustained injury thereby, then you will find for the plaintiff such damages as you may find from the evidence he sustained by reason of such negligence, if any, in respect to any of the matters hereinbefore charged, and you will assess the damages against the particular defendant responsible therefor, as hereinafter directed."

Appellant Santa Fé asserts that the evidence shows that when the cattle were delivered to the Missouri Pacific Railway Company at Wichita, Kan., that the cattle had only been on the cars 28 hours and 40 minutes, and that the shipper in charge of the train requested that the time be extended to 36 hours. There is testimony in the record from which the jury could have found that the customary time for making the trip with the shipment of cattle was from Simmons, Tex., to Summit, Kan., from 24 to 30 hours, and that the usual and ordinary rate of speed for the transportation of cattle trains was from 14 to 18 miles per hour. The jury had testimony which would have warranted them in finding that the Santa Fé on the last division ran only about 12 miles per hour and on the division next to the last only about 13 miles per hour, and that the cattle were held by it at Wichita nearly two hours before they were delivered to the Missouri Pacific Railway Company. We think there was sufficient evidence of slow time in running and delays en route from which the jury could have found that the Santa Fé was negligent and that such negligent delay proximately contributed to holding the cattle on board the cars without feed or water beyond the required time.

[9] Be that as it may, we think the jury was sufficiently instructed not to find anything against the appellant if they found it was not guilty of negligence proximately causing injury to the cattle. The court sufficiently, we think, guarded the rights of the respective parties in the charge complained of and in other portions of the main charge. Paragraph 6 of the court's charge is as follows: "There is no evidence of any partnership between any of the defendants; therefore each defendant, if liable at all to plaintiff under the law and testimony of this case, is only and separately liable for only such damages as resulted from its own negligence or that of its agents, servants, and employés, if any, in the handling of said shipments of cattle. If you find from the evidence that one or more of the defendants were negligent, as elsewhere defined in this

charge, and that plaintiff sustained damages in consequence thereof, then you will find for the plaintiff against such defendant as appears from the testimony was guilty of the negligence that proximately caused the injury, if only one of them, and, if more than one of the defendants were negligent proximately causing injury and damage to plaintiff's cattle, then you will find against such defendants separately, stating the amount you find for plaintiff against each of them, and you will find in favor of such defendant or defendants as you do not find were negligent." Again, in pargraph 7 of the court's charge, he told the jury: "And no defendant in this case can be held liable in damages for any delay or injuries to the plaintiff's cattle from any cause not occasioned proximately by its own negligence."

[10] In the tenth assignment complaint is made at the action of the court in refusing to give special charge No. 14, which in substance is that the jury, in arriving at the market value of the cattle at Summit, Kan., in the condition in which they arrived there, might consider the subsequent history and development of said cattle in fixing such market value. The court instructed the jury on that point as follows: "If, under instructions given you, you find that the plaintiff is entitled to damages * * * on account of injury to cattle resulting in depreciation of their market value because of the negligent acts of the defendants, or any of them, as herein charged, then the measure of plaintiff's damages will be as follows: Second. As to the cattle that remained alive and were injured, if you find that they were injured by the negligent acts of the defendants, the difference, if any, in the market value at Summit, Kan., of such cattle in the condition and at the time they arrived at Summit, Kan., and their market value in the condition and at the time they would have arrived at said place had they been transported with ordinary care and dispatch. Fifth. You may consider the evidence introduced as to the condition of plaintiff's cattle on the dates subsequent to their arrival at Summit for the purpose of determining their true condition and the extent of the injury to them, if any, at the time of their arrival at Summit."

All the cattle were shipped to Summit for pasturage and were all held there until July, 1910, and a part of them until October, 1910. There is much testimony in the record as to the condition of the cattle upon their arrival at Summit, as well as opinion testimony as to the time it would take for them to recover, as well as some testimony as to how the cattle prospered while in the pasture at that place. If it was proper for the court to charge on the question at all, we think the court's charge substantially submitted the proposition as requested by appellant. The charge of the court, we think, is substantially correct in presenting the measure of damages. Railway Co. v. Word, 51 Tex. Civ. App. 206, 111 S. W. 753; Railway Co. v. Stanley, 89 Tex. 42, 33 S. W. 109; Guinn v. Railway Co., 142 S. W. 63.

[11, 12] The appellant the Missouri Pacific Railway Company alleged that it transported the cattle in question from Wichita, Kan., to Summit, Kan., and that on the 17th and 18th days of April there developed an unexpected and serious congestion of traffic on its line of railway between said two points, due entirely to unprecedented heavy delivery of cattle to said appellant by connecting carriers; that it had prepared to meet the usual and ordinary shipments for that season of the year, with trackage, cars, and motor power, but was not notified of the unprecedented shipments at that time, and therefore was not prepared to handle the shipments in question in the usual and ordinary time, and that any delay in the handling of the shipments was due to such congested condition; and further alleges: "That any and all delays that were experienced by the plaintiff in the handling of his cattle at Wichita and Summit were caused and due entirely to said unexpected and unprecedentedly heavy offering of cattle, and that the defendant did not know of such impending rush of business, and by the exercise of ordinary care could not have known of the same in time to have provided extra equipment, trackage, and men in time to have handled said cattle, including the plaintiff's, all within the usual and customary time. That it had used due care to provide in advance of the spring cattle movement at such points a sufficient quantity of motive power, cars, men, and trackage to carry safely and expeditiously all cattle and such increase as from its past experience could reasonably be anticipated as being offered for shipment by it at and between Wichita and Summit, Kan."

There is no allegation that it notified the appellee, Word, or the shipper in charge of the cattle of the congested condition with reference to the traffic at the time it received and accepted the cattle for shipment. There is testimony which suggests that, at the time the cattle in question were handled by the Missouri Pacific Railway Company over its line of road, there was an unusual heavy shipment of cattle to the pasture grounds in the Flint Hill country in Kansas, to which point the cattle in question were consigned. The evidence indicates that there were unusual delays while the cattle were en route from Wichita, Kan., to Summit on account of the number of cattle trains being unloaded at various points, engines and trains passing for water and the like, from, which a jury could have inferred that there was an unusual shipment of cattle at that time. Some of the witnesses state they had no previous notice of the shipment of cattle in question. One witness states, how-

ever, that they had from 6 to 12 hours notice before the arrival of the cattle at Wichita, Kan. There is nothing in the record which shows that appellant or that any of the connecting carriers at the beginning of the voyage, during its continuance or at Wichita, Kan., or anywhere, notified appellee or his shippers or employés that there was any congestion or an unusual heavy traffic. They each and all accepted such cattle for transportation in the usual and ordinary way, without giving such notice. Under the pleadings and evidence, the trial court instructed the jury to disregard the plea of appellant, setting up the unusual condition with reference to the traffic.

Appellant requested the following special charge: "You are instructed that, if you find and believe from the evidence that such congestion arose and existed as pleaded by said defendant as above set out, then said defendant would not be liable for and you cannot find against it for any damages resulting to the plaintiff's cattle from delay or delays due solely to said congestion. If you do not find and believe from the evidence that such congestion arose and existed as pleaded by the defendant, then the same would not be a defense to such damages, if any, to the plaintiff's cattle as you may find proximately resulted from negligence, if any, on its part, in causing or permitting such delays." The foregoing portion of this charge is subject, however, to the following proviso: "If, before or at the time of accepting the plaintiff's cattle, said congestion had arisen or was arising, and such fact was known to said defendant or by the exercise of ordinary care on its part could have been anticipated, and it was known by it or by the exercise of ordinary care, it would have reasonably anticipated said cattle would be delayed in their transportation from Wichita to Summit by reason of its inability on account of such congested condition to transport them within the usual time, then, in order for such congestion to be a defense to damages resulting from delays caused thereby, said defendant must allege and prove that it notified the plaintiff or his authorized representative or person in charge of the cattle, in tendering them to the defendant for shipment, of said congestion or anticipated congestion and consequent liability of the occurrence of such delay or delays. Said notice would not be necessary to said defense if said congestion arose subsequent to the time said cattle were accepted, or if the defendant before or at the time of accepting the said cattle did not know, and by the exercise of ordinary care would not have known, that such congestion had arisen or was arising or would arise, and that the same would render it unable to transport plaintiff's cattle in the usual time required for such transportation." This charge was refused by the trial court.

Assignments from 1 to 5, inclusive, will be considered together. The appellant, upon ac-

cepting the cattle, undertook to transport them with reasonable dispatch to their destination, and if, when it accepted them, it had knowledge of the condition of the heavy shipments at that time, it was made its duty to notify the shipper of such condition, which would likely cause extraordinary delay so that he might determine for himself whether he would take the risk of the delay. When the delay occurs out of the usual and ordinary, which the carrier seeks to excuse by showing the existence of unusual conditions, it assumes the burden and must by its pleading and its evidence show the very fact to the validity of its excuse. Appellant alleged that there unexpectedly developed a serious congestion of traffic on the 17th and 18th, and that it did not know of such impending rush. Whether this rush was on or before or after the arrival of the cattle at Wichita and after their acceptance by appellant, the pleadings are not clear on that point. The evidence, we think, in conclusive that the cattle were accepted and were started on appellant's road; but, on account of the fact that trains were being unloaded on its line of road, the appellee's cattle were held on the track for several hours longer than necessary. The conductors state that they were laid out on account of engines running for water, passing passengers trains, and by reason of the unloading of other trains ahead of them. We do not believe a jury would be warranted in finding that appellant did not know, or could not have known by ordinary diligence, that appellant had trains of cattle on its line of road to be unloaded at points, which would interfere with the movement of appellee's cattle. Certainly appellant was charged with knowledge of the trains and shipments on its own line of road. These shipments clearly appear to have been on the road when it received the cattle. If it had refused to accept the cattle, or if it had notified the shipper or its connecting carriers of the then unusual condition on its line of road, such condition might have been an excuse for the delay. The question would have been different if appellant had refused to accept the cattle. The plea under such condition might have presented a good defense. M., K. & T. Ry. Co. v. Stark Grain Co., 103 Tex. 542, 131 S. W. 410, and authorities cited; Railway Co. v. McAulay, 26 S. W. 475; Railway Co. v. Anderson, 3 Tex. Civ. App. 8, 21 S. W. 691; Railway Co. v. Smith, 63 Tex. 326; Railway Co. v. Felker, 40 Tex. Civ. App. 604, 90 S. W. 532.

[13] If the congested condition arose on account of unexpected traffic after accepting the cattle without its knowledge or which could not have been reasonably anticipated by the exercise of ordinary care, appellant asserts such would be a defense to the charge of delay. If this is true, which we do not now decide, we do not think the pleadings or testimony show such a condition. It is not alleged that such condition did not exist

and was not known to, and could not in the exercise of ordinary care have been anticipated by, appellant, when the cattle were accepted for shipment. It is alleged: "That at the time these cattle were received it did not, on account of the unexpected heavy offer of cattle for shipment to such point, have a sufficient quantity of motive power or rolling stock, nor did it have sufficient trackage facilities to handle the cattle, including plaintiff's, within the ordinary time." The first train of cattle was received by appellant at Wichita, Kan., April 17th, at 9:40 p. m., and the second shipment at 2 a. m., April 18th. Plaintiff's witnesses show that on April 15th there were some delays and April 16th considerable delay and heavy traffic and on the 17th delays causing congestion, whether before or after receiving the cattle in question the evidence does not show. It is shown the distance from Wichita to Summit was less than 50 miles. The cattle were started out on appellant's road but were delayed several hours on its tracks on account of delay in unloading other trains on the track ahead of the cattle in question, by engines passing for water, and by the passing of passenger trains. To our mind it conclusively appears other trains were on the track of appellant before it accepted the cattle and left Wichita. In that short time and distance it must have known of the condition on its own line of road, which, if congested, the jury must have found that appellant, with any sort of diligence, would have ascertained when it accepted and received the cattle for shipment. We believe there was no error in the court's action in instructing the jury, under the evidence and the pleadings, to disregard the defense so set up and refusing appellant's requested instruction. The assignments are therefore overruled.

[14, 15] The sixth and seventh assignments complain of the fourth paragraph of the court's charge. We refer to what has been said in answer to the Santa Fé's eighth assignment for paragraph 4 there set out. We also set out the seventh paragraph of the court's charge: "Delay to cattle in transit to be actionable and to afford a basis of recovery by the owner against the defendant, upon whose line the same occurs, must be shown by the evidence to be unnecessary and unreasonable and proximately caused damage to the cattle; otherwise it is not actionable and does not afford a proper basis for damage, and no defendant in this case can be held liable in damages for any cause not occasioned proximately by its own negligence, even though said injuries may have developed on its line of road while the cattle were in its possession." We do not think the charge as a whole subject to the criticism that it burdened the appellant with the penalty of handling the cattle at its peril, "so as to avoid injury to the cattle." The carrier, perhaps, does not occupy the position of insurer as to the time in which the cattle are to be transported. Trout & Newberry v. Railway Co., 111 S. W. 220. But as to handling them otherwise, we think the rule of the common law prevails in this state and is also recognized by the Supreme Court of the United States in the absence of an agreement between the parties relaxing the rules of the common law. Southern Express Co. v. Caldwell, 21 Wall. 264, 22 L. Ed. 556; Railway Co. v. Trawick, 68 Tex. 314, 4 S. W. 567, 2 Am. St. Rep. 494.

The eighth and ninth assignments are overruled for the reason given in disposing of the Santa Fé's tenth assignment.

[16] The tenth and eleventh assignments complain of the action of the court in excluding part of the testimony by deposition of T. J. Stone and Bumstead. The assignment, proposition, or statement do not disclose the particular evidence excluded, the objection made, or anything from the record which will enable us to determine from the brief whether the court was in error in excluding the offered evidence. We are simply referred to the record to find out what the testimony was. The proposition under the assignment is in the nature of an argument based upon certain asserted conditions surrounding the witnesses. The general statement in the assignment is that the witness was not permitted to state that the delay was occasioned by the blockade along the line ahead of him. We cannot tell what the witness said was the occasion of the blockade from the assignment or statement. We do find as a fact set out in appellant's brief, as well as that of appellee, that several witnesses testified that the trains were delayed by unloading of other stock trains ahead of them and engines passing for water. We do not think any injury is shown to appellant by the rulings of the court.

The twelfth assignment is overruled for the reasons given in considering this appellant's first to fifth assignments, inclusive.

[17] The thirteenth assignment is not briefed in accordance with the rules. The testimony objected to is not given, the objection made or any of the attending circumstances set out by the brief, so this court can determine just what issue he passed upon. We are referred to the transcript for information. From what is stated by appellant and the appellee, the ruling of the court on the objection made was correct but if not, in the light of the entire record, his ruling was harmless and no injury resulted to appellant therefrom.

We do not think there is reversible error shown, such as will require a reversal of the case, and we therefore affirm it.

Affirmed.